Good afternoon, ladies and gentlemen. We are here for the re-hearing en banc in the consolidated cases of McDaniels v. Kirkland and Jenkins v. Evans. Mr. Kutchins, are you ready to proceed? I'm A.J. Kutchins. I represent the appellant Jenkins, but I am arguing on behalf of both of the appellants. If I may, I'd like to reserve seven minutes of my time for rebuttal. May it please the court. Clearly established federal law requires every court reviewing a Batson claim to examine the totality of the relevant facts. There are no facts more relevant to a claim of race discrimination than those showing that members of the affected group, African Americans in this case, were treated differently than those who were similarly situated. But the state court of appeal refused to make that comparison. Because the state court refused to consider facts pertinent to the appellant's constitutional claim, the resulting decision was contrary to and in unreasonable application of clearly established federal law. The state court's decision cannot be afforded deference under 2254 D.1. Counsel, aren't we also examining the ruling of the Superior Court judge who oversaw the selection of the jury? And didn't he have all of the relevant facts before him, including the jury questionnaires? And he had observed the voir dire of the veneer, did he not? Judge Coleman, it was she, and yes, she did. Okay, and so when the state court of appeal looked at that decision, do we look at both the determination by the district court of appeal and the Superior Court judge in evaluating whether or not the jury was fairly selected? The principal argument we're posing is that this court doesn't look at the decision of the district court of appeal because the district court of appeal chose to ignore facts crucial to the examination before it, and thus is disqualified from deference under 2254 D.1. Didn't you fail to present some of that information that you're now criticizing the DCA for not considering? I'm sorry, Judge Callahan, I didn't hear you. Well, there were jury questionnaires and the transcript for the first day of voir dire, and you didn't present those, right? Well, I wasn't there. Well, but you being your partner. My client's appointed lawyer did not present them well. Make it part of the record. Only the court of appeal could make it part of the record, but I get where you're going, Judge Callahan, and I think it's a false issue, the question of whether appellate counsel's failure to augment somehow waived the issue or created a procedural default or something of that nature. There are really three reasons. The question is whether or not the petitioner has the burden, if he's challenging the fairness of the jury selection, to bring before the reviewing court all of the relevant information, and he never asked anybody to prepare the transcripts or to preserve the questionnaire, so why should we attribute that error to the state? That's exactly where I was going, and the counsel doesn't ask. Let's start with the fact. Can you answer my question? Yes. A, does he have the burden, and B, is it not true that he never asked? I don't think it's fair to say that he has the burden, and the fact is, and this is what I was attempting to answer, Judge Tallman, is the California appellate procedure is very different than federal appellate procedure. Well, I used to be there, so it's not that different that you didn't have the burden, and I guess I'm going to dogpile on you a little bit, too, in the sense that you've never even made a showing that there was anything in there that was prejudicial. Never made a showing that there was anything in there that was prejudicial? Well, what in the first day of voir dire and the transcript of the first day and the questionnaires, what evidence was in there of racial prejudice? There is an enormous amount of evidence in there. There is, in the questions that the district attorney asked Juror Hilton, who was examined in the first day of voir dire, when it came time to give a rationale, the prosecutor said, oh, well, in my exchange with him, he seemed sympathetic. Were any arguments about Hilton made in the Court of Appeal? Pardon? Were any arguments about Hilton made in the State Court of Appeal? Not to my knowledge, they weren't. The opinion doesn't address any? Pardon? No. The Court of Appeal doesn't address any? No. So there's three jurors in the State Court of Appeal, and then you have a COA to this court on two jurors, is that correct? I believe there were four jurors that were cited to the State Court of Appeal. Can I ask one question? The State Court record does show that there was a request to augment the record. Yes. So what exactly do we know about whether there was or wasn't a request by whom and why it was augmented only partially? Well, ironically, the state, which in federal court had the burden of supplying the state court record here, did not supply anything that would answer that question. Counsel, I think we've asked this repeatedly, but I just want to follow up on Judge Berzon's question because on page 16 of the petition for rehearing, Jenkins and Daniels argue, quote, in fact, they did move to augment the record to include the jury voir dire. So there was a motion filed to do that. There was a motion filed. Okay. And what did you seek to have added? Again, I wasn't there. And, again, that motion is in the federal court record. My understanding is that they sought to add the jury voir dire. Whether they did so completely or effectively, I cannot say. When you say jury voir dire, are you including the questionnaire? No, not the questionnaire. And not day one? I would expect it would include day one, but either they failed, either counsel failed to mention it or the court failed to include it. One way or another, day one was not included. Do you happen to know what date day one was? Yes, because there is, again, in the docket sheet it says what dates were asked for. Okay. And I'm wondering what day was it. My guess is that it will show that day one was not included. Can I ask you a question that focuses on the federal court's duty, not the state court's duty? Yes. Let's assume for a second that there's no clearly established Supreme Court law that says the state court must conduct comparative juror analysis. But Miller L. seems to tell us that federal courts must. Did either of the district courts in this case conduct a comparative juror analysis? Let's read some more. Apparently in McDaniels the judge did. Well, if you don't know, just tell me. But all I see in both cases is a judge not doing a comparative juror analysis but simply parroting what the state court said, which is that the same question was asked of seven other people. Is that right? My understanding is that Judge Hamilton in McDaniels did conduct some form of comparative juror analysis. Tell me where in the opinion Judge Hamilton conducts a comparative juror analysis. I'm sorry. I can't do that, Your Honor. Okay. Well, isn't it kind of important to know in this case whether the district court did a comparative juror analysis? I don't think so, Your Honor. Because you're hanging your hat entirely on D-1. My question is a different one, which is that don't we review the state decision to see whether it's unreasonable? And in doing so, Miller L. tells us that we must do a comparative juror analysis. So it would seem to be quite relevant to know whether or not the district court did one. You don't know the answer to that question? No, Your Honor. I can't answer that, and I have to express a difference with you. Well, you may express a difference, but I'm asking you a factual question. You don't know whether the district court in either case did a comparative juror analysis. Mr. Timore, who was Mr. McDaniel's attorney, says that the district court in his case did. I can tell you that in Jenkins the district court did not. So perhaps if Mr. Timore is right, you have differing interests in this case. I do not agree. This Court reviews what the district court did de novo. I don't think that what the district court did is correct. Well, I guess let me tell you where I'm coming from. Yes, sir. I think the district court in either case did a comparative juror analysis, and it seems to me that it should have. Now, put aside for a second what materials it should have had reference to. That's the issue that I think we're here about and I haven't heard much about yet. But if it should have done it, it seems to me we have the duty to send it back to the district court to do one. We could do it in the first instance, but that means 11 of us review the record in the first instance, and I've got to tell you we're not very good at that. If, you know, if the court sees fit to remand it for a comparative jury analysis in the first instance in the district court, so be it. I believe that in other cases, including, for instance, in Millerell, the Supreme Court itself did the comparative jury for the first time. So let me ask you one more question while I still have your attention and I'll give up. Yes, sir. Now, if you think this is a D-1 violation, why would we do an analysis at all? Why wouldn't we just reverse the convictions and order the writ granted? My understanding of AEDPA, which I hope is sound, is that the first question, the D-1 question is, are you going to defer to what the state court of appeal did? If you're not, then this court reviews de novo the question of whether there was a Batson violation. D-1 is about an unreasonable application of law. D-2 is about an unreasonable decision of fact, correct? Yes. If you think there was an unreasonable application of law here, why in Millerell did the Supreme Court undertake its own evaluation rather than simply reverse? Because the question wasn't posed to it in Millerell. I think it's pretty basic that a case is not authority for issues that were not presented to the court. What question wasn't posed? The question of whether the lower court's failure to conduct a comparative analysis was basically abrogated D-1. But you still would say, as you did and as I think is correct, that you would not then reverse. You would then, if you concluded that they applied the wrong standard by not doing the comparative analysis, you would then decide the merits of the case but without deference. And that would be true as to both. I mean, whether you call a Batson analysis legal or factual, which is a little fuzzy, you would still do it de novo. But you wouldn't reverse for that reason. No. It's just a kind of way station or a — A gateway. Yeah, a gateway. Exactly. Exactly, Judge Broussard. Did you argue it to the district court? I mean, you've not taken the time, I take it, to take these questionnaires and match them up with the jury voir dire, with the particular jurors that are available. Yes, I have. And where is that in the record? You mean, did I set all of that out in the record? Yeah. Only where it was pertinent, where I believe that it showed evidence of pretext. Okay, so — Which goes to Judge Callahan's question, which I would love to get back to, which is all of the evidence of pretext that — Well, yes, but it would be good to get back to it. But it would be good to get back to it with a particular emphasis on why the comparative jury analysis would have mattered. Because I'm not sure — as far as I can tell, and you can tell me if there's more, there are two instances. One was this question of checking off the box about whether he was racially — what his race was, and the fact that there were other people who did that. And the other one — and I don't remember who he is — that was not one of the jurors who was actually on CLA. And the other one was, I guess, what was mentioned, and that was the question of whether the sympathy question was asked with some pattern or not. Is that it? Is there anything else? Yes. In addition, as to Juror Hilton, the prosecutor said in explaining his reasons that, when I talked to Mr. Hilton, he seemed somewhat sympathetic because of the situation with his son towards the two defendants. Apparently his son had been involved in some sort of a criminal case in New York. It is significant that the prosecutor was not similarly troubled by the fact that several of the non-African American jurors had children or close family members who had been convicted of crimes. That is another comparative factor. Another thing about that justification, which only Judge Callahan came up because of the additional record, is that it was false with the prosecutor. Were those other people sympathetic? Did they say they were sympathetic? Did who say they were sympathetic? You said the other non-African American jurors. Did they indicate that they might feel bad or identify with the defendant because their children had been in trouble? No. None of the jurors who were queried said that they would be sympathetic to the defendants. I think I may be missing something. My understanding is that, in Hilton's case, his son was a victim of a crime rather than convicted of a crime. Am I not correct? That is not entirely clear because Hilton's questionnaire was just destroyed after the trial. So they talk about the situation with his son. The questions asked about would you be sympathetic to the defendants suggests that he was somehow involved in a crime. How can you say that? I'm having trouble when I look through the juror questionnaires and the voir dire and the state court and put them all together and say, well, now, what is the beef exactly? And I haven't heard that from you as to whether it's a comparative beef or whether you think that that's in stage three was a pretext. Because let's take Hilton, for example. I don't think he was in the COA. But you've just said, well, it seems like he probably also was involved in a crime, but you don't know. So how even could a district court or a court of appeals on appeal try to conduct a new comparative jury questionnaire when you don't even know what the answer is and you don't know the answer? Because regardless of what the answer to that question was, it betrayed pretext. If he was involved in a crime and that was a reason for bumping him, then the fact that many other jurors had children who were involved in crime would demonstrate pretext. If he was not involved in a crime, then we have the situation that arose in Ali, which is that it's absolutely, if he was in fact a victim of a crime, the same issue came up in Ali. And Judge Berzon, in her opinion there, pointed out that this is to kick somebody because they have a child who was a victim of a crime doesn't speak to the case before the court. It's a false predicate. Either way, what we have is proof of pretext. Why is it proof of pretext? I mean, did you compare it to the other jurors that would be a potential victim of a crime person? It would be proof of pretext because being a victim of crime would only make the juror more sympathetic, not less sympathetic. It had no rational relationship to any desire that the prosecutor could have to not have that person on the jury. This was the analysis that was essayed in Ali. Is that the only example of prejudice you have? You don't have any other juror that's a victim situation, right? Any other juror that's a victim? Not that I know of, Your Honor. Is there any difference that the juror questionnaires are so truncated because we only have the ones who actually got on the jury and not the ones who didn't? I gather you're not playing about that as a separate issue. No, Your Honor. So is there anything meaningful that can be done with this truncated set of questionnaires? I believe and I have sought to demonstrate that there is ample proof of pretext on what we do have. Yes, but that's not the question that I'm asking right now. We could do the pretext analysis without getting into any of this question about whether they should have gone to comparative analysis or anything else. In other words, we could just do it on what they've got. So the only reason why any of this legal issues matter, assuming they're legal issues, is if there's something in the one day of trial transcript, if there's something that the comparative analysis would have added. So that's why I'm asking you whether without, you know, with this truncated set of questionnaires, we can do a meaningful comparative analysis that's different than what you could do without them, without any of them. Yes, I submit that you can do a meaningful comparative analysis of the difference between how Mr. Hilton was treated in the regards that I pointed out and how other jurors were treated. That in itself is a meaningful. You can't do a global analysis, but that's really not necessary. Batson teaches that pretext adds to one juror. The discriminatory elimination of one juror is sufficient. It also, the case law is quite clear that whether he was in the COA or not. Does it matter at all how the jury ended up with three African Americans, I think three Hispanics, and some other mixes, and that the prosecutor was African American? The fact that the prosecutor was African American doesn't matter a whit. The prosecutor in Johnson v. California was also African American. That didn't slow the Supreme Court up in holding that there appeared to be racial discrimination there. But does it mean anything? No, I don't think that means anything. The fact that some African Americans ended up on the jury is some contrary indication, but it's not terribly weighty given that 70 percent of the African Americans were struck, while only 30 percent of others. Counsel, the only argument raised in the trial court, the Batson challenge, was repeatedly asserted that seven out of ten African Americans had been bumped. But I don't see anywhere, including when the motion was argued, where defense counsel really articulated the basis for the challenge, right, that someone was treated differently because he or she hesitated or didn't hesitate or had a family member convicted of a crime. So I'm left with the impression that defense counsel expected the trial court to understand the basis for the challenge, the comparator, and then answer it. The trial counsel did not attempt any comparative analysis because it was essentially forbidden in the California trial courts at the time of our client's trials, which was the California Supreme Court issued just months before the trial in this case. They said, we have previously rejected a procedure that places an emphasis on comparisons of the stated reasons for the challenged excusals with similar characteristics of non-members of the group who are not challenged. Such a comparison is one-sided, and it is not realistic to expect a trial judge to make such detailed comparisons mid-trial. So my question is, it seems to be the case that the defense counsel didn't. The defense counsel did nothing more than say, objection, Batson, seven out of ten. I'm paraphrasing, of course. But have I missed it in the record? They did a little more. One of the attorneys took exception to the prosecutor's assessment of the demeanor of one of the structurers. At the very end, when the motion was argued, one lawyer said, submitted. I think literally said, submitted, and that was it. And another one said something to the effect that two of the seven, he felt they had not hesitated, and then said to the trial court, but you saw what you saw, and she went on to rule. Understanding that that is a paraphrase, have I missed anything? No, Your Honor. All right. I would have thought you would have gone to Reeves, to be honest. The juror. Isn't he the one who kind of supposedly looked at the prosecutor, who's Mexican-American, and kind of like, how could you be a DA? And so you're off here on all this other stuff. What about that? I wanted to get there. Well, why didn't you start there? Is it the only thing that is actually where race came into play? No. Another place where race came into play was with Ms. Andrews, where when asked his reasons, the prosecutor said, well, first, she doesn't even look black, which an odd comment. And at best a non-sequitur, but it does, as the court said in Kessler, betray a certain preoccupation with race. Well, it doesn't in the sense that that's the precise challenge, is that potentially he's striking yet another black juror, and he's saying, I didn't even know she was black. No, he said, I knew she was black because it said so in her questionnaire. So I knew she was black. But he said, she doesn't look black. But he doesn't look black. And the transcript shows very clearly she absolutely understood what was happening, and correctly answered the question regarding the presumption of innocence. So then it comes down to, and I hope you'll answer for us, what about the other challenges that she, I think they said, looked weird, hesitated, and was a bit intimidated. What about those? Well, those are demeanor justifications. And Snyder teaches very clearly that a reviewing court can't credit demeanor justifications unless the trial court has explicitly. The trial court in Snyder v. Louisiana gave no explanation at all, nothing. And in that circumstance, the Supreme Court was willing to say, we can't credit this because we don't know what the trial court was thinking at all. Here we had a response from the trial court. Why was it inadequate? It was inadequate because what the trial court said is, the trial court did not comment on the demeanor justifications. And that's what Snyder requires. You know, to say, yes, she did appear confused, or yes, he was giving a mean look. Or he didn't comment, did it, on anything about her specifically? She didn't comment on any of the, what she said, and all that she said is, there doesn't appear to be racism going on here. His explanations are race-neutral. No, just globally. Are race-neutral on their face. That's why it seems to me so important when we talk about whether we're going to fault the trial court for not making these specific observations. In fairness, no specific challenges were made either. Right? Well, actually. Except the one. Except the one that we just reviewed about hesitation. Right. So my question is, why were the trial court's findings inadequate? Because Batson and Millerell require that the trial court do a thorough analysis of the record. And for itself, in terms of why its explanation was inadequate, two reasons. One is, to the extent that there are demeanor justifications, the trial judge has to say yes or no about that. What case stands for that proposition? Snyder versus Millerell. Snyder was decided eight years or so after the appellate court rules. And Thaler v. Haynes said, in that case, we don't consider it in adjudicating what the trial court, the state court said. So what's the effect of the fact that Snyder was not clearly established law at the time the state court ruled? Snyder is merely an explication of the duty under Batson. Thaler v. Haynes rejected that analysis. Well, what did this judge do, if anything, to ensure that there was a trial, that racism was not interjected? Did he do anything? All that she said. I'm sorry. That's fine, Judge Pragerson. All that she said is, there doesn't appear to be racism. The justifications were neutral on their face. That is not what Batson requires. Well, when Batson was raised, did they go to the sidebar? At some point, I believe they did go to the sidebar. I don't know if they were off the record. I don't know. Well, each time it was raised, didn't they go to the sidebar and resolve it right there with the judge? And there was just a few comments made, like this person is weird, that's why I excused him. No, actually, they had a separate motion hearing in which two matters, a motion to disqualify trial counsel and the Batson, what they called the Wheeler claim. So while this trial was going on, are you saying that no Batson objection was made while the jury was being voir dire? I believe the Batson objections were being made, and it is typical in the California courts to hold them until the voir dire is completed and then have a Batson motion. They do it various ways, but that's a very typical way. What the record says is that on the motion, the Wheeler motion in the state court, the Jenkins counsel just rested on the papers, and the Mr. McDaniels counsel actually talked specifically, I believe, about Mr. Reeves and Ms. Andrews. Yes. So go back to Mr. Reeves. I think Ms. Brown, actually. Was it Brown? Well, you know, actually, he said Ms. A. That's what the state court says. I mean, you know, the problem is you don't know the record. We're asking you, did they say this? Did they say that? You say, well, I don't know. I don't know what they did. Well, how can we know if you don't know and you haven't put those in front of us? Do you discount what the state court of appeals wrote, that the issues argued other than on the papers were as to Ms. A. and Mr. R.? Ms. A. and Mr. R.? Right. I don't know. I'm reading them. Maybe they're just wrong when they said what they ruled on. I don't understand their argument. I'm not sure what it means that they were argued on the record. I mean, in terms of trial counsel getting up and saying anything, yes, I believe it was about those two jurors. And so as to you never even really finished with Mr. Reeves. So do you need a comparative jury analysis to analyze Mr. Reeves? No. He went for Ms. Andrews, either? No, I don't believe that you do, except to the extent. Which exactly? Why don't you let him finish? What's the story with Mr. Reeves? Just tell us what's your argument on Mr. Reeves. My argument on Mr. Reeves is that the entirety of the prosecutor's justification for striking Mr. Reeves was demeanor-based. And there is no indication that the trial court affirmed that. Don't we know that without reference to the supplemented record? That? Yes. So then, therefore, we would review the state court's determination that this was not pretextual at pedeference, wouldn't we? If you did not go to the supplemental record? Well, no, the argument you're making, you just told me, is not based on the supplemental record. It's based on the demeanor-based objections, which appear in the record that was in front of both the court of appeal and the district court, right? That was not in the supplemental record. That was not in the supplemental record. Okay. So, therefore, this record was in front of the state court. The state court found no pretext. So as to that particular juror, we would have to define that that finding of no pretext was an unreasonable finding of fact, wouldn't we? No, because I don't think that you segregate one juror at a time in determining whether there was a Batson violation. You have to look at how other jurors were treated, so it informs. No, but your objection is that the demeanor objections are not specifically supported by the judge's findings. That, as to Mr. Reeves. We don't need to look at any other juror with respect to that argument, do we? Not as to that argument. Okay, so as to that argument, if you're going to prevail, we'd have to find that the state court's finding of no pretext was unreasonable based on this record. No, I think that there's a little bit more, Your Honor, which is that you look to see how in determining whether there was pretext as to juror A, you look to see how other members of the affected group were also treated. And so the fact that the prosecutor gave a raft of pretextual reasons for bumping Juror Hilton bears very importantly on what happened with Mr. Reeves, given that we have no ruling on whether or not the demeanor justification, which was the only thing said, was valid. So that's a wash. Let me just stop there. Not so fast. The Court of Appeals talked specifically about Mr. Reeves and these hostile looks and the sort of characterization. And then they say, well, that was a good reason for the challenge. And they answer that. Why isn't that enough? I mean, what more do we want? You want the trial judge, who is supposed to, according to Snyder, make the determination as to whether that was a genuine reason or not, based on the credibility of the person's report. But he said they, I thought the trial judge, that she ruled that they had met stage three on Batson on these challenges. She never said that, Your Honor, with all respect. What did she say? What she said is there doesn't appear to be racism. The reasons given were race neutral, appear to be race neutral. That is a response to step two of the Batson. Why isn't that an implied credibility finding? Pardon? Why isn't that an implied credibility or demeanor finding? When she sat through the whole thing, there isn't a specific challenge raised about any one of these factors that we're talking about now. And she said that she thinks there did not appear to be discrimination going on. If that was sufficient, then the Supreme Court wouldn't have said in Snyder that it was insufficient. In Snyder, basically, the judge said. Snyder is after. Snyder is after. Yes, Snyder is after. But what we're talking about is an analytical mode. We are not talking about a new rule of law. What about Fowler? You haven't responded to Fowler. Wasn't Fowler specifically about the question of whether Snyder established the rule that you're asking to apply? I think they were right. What Fowler said was you can't extend Snyder to say that the judge has to have personally viewed the interaction between the prosecutor and the juror. But it did not alter Snyder's ruling that the judge has to make an explicit finding. Right. And so it seems to me the obvious way to distinguish the two cases which you have not answered is that in Snyder the judge did nothing. The judge really did no reasoning whatsoever before saying that the challenge was denied. And in those circumstances, the Supreme Court said we cannot credit that because we don't have a finding. But here we have a different record, counsel. Here we have a state court judge not presented with any specific Batson challenge who said, having seen it all, she said it doesn't appear to me that discrimination is going on. And my question is just why isn't that adequate? Because we can't – this court, no reviewing court can adequately determine the validity of – at each stage, there has to be an examination of the validity of the justifications given. And if it's enough to say motion denied, which is really what it came to. Counsel, the point is that it's all relevant. It's all relevant to the challenge being made. And it seems to me – it goes back to my very first question for you. You're really expecting the trial court judge to anticipate the challenge and then answer it and then make a finding about it because nobody jumped up and said this is about treating these jurors differently on the basis of hesitation or a crime in the family or anything specific for her to respond to. There are myriad cases where the trial judge has said, I agree, that juror seemed confused. It wouldn't have taken more than that. Absolutely, and it might be that the trial judge jumps in and saves your client by dreaming up the argument for him. No, this is where the trial judge jumped in and saved the prosecutor in the instance that I gave. I know of no case in which a Batson challenge turns on how vigorously it was asserted. I'm just talking about mentioning. It was mentioned by the prosecutor. What's mentioned in this case is out of ten. It was mentioned by – he said this was my justification. It was her demeanor. It was his demeanor. At that point, it is the trial judge's duty to say yes or no. In addition, as was pointed out, one of the trial lawyers did say, I don't agree about the demeanor justifications. Okay, Mr. Cutchins, your time has expired. Thank you, Your Honor. May it please the Court, Arthur Beaver for Appellees Kirkland and Evans. I'd like to respond briefly to some points that the Court raised with Mr. Cutchins. First, regarding his discussion about the meaning of SNIDER, we don't read SNIDER to require an explicit finding that the trial court credit a demeanor justification specifically. SNIDER stands for the unremarkable proposition that when you provide a very terse ruling and one of the two reasons offered is pretextual, you can't, as a reviewing court, say that the court was relying on the good one, not the bad one. Here, we don't have that problem. Regarding Juror Reeves, as the Court noted, it was a demeanor justification. There is no other leg that the prosecutor was trying to stand on. It's more than demeanor. It's a little unusual. It's a race-based demeanor because the interpretation of the prosecutor, who is African American, is that this guy is looking at him and going, like, how could you be a DA? So it was race-based. Now, whether it was permissible or not seems to me to be another question, but why wouldn't you characterize it, for starters, as race-based, whether it's demeanor or not? I disagree with how you characterize the district attorney's comments. I believe that his comment was, again, I'm paraphrasing, as an African American, I get used to certain looks. You get used to certain looks from African Americans. He's simply saying that I'm aware of certain personal animosities as a result of my race from certain other people. No, certain other people who are African American. You keep leaving that part out. I apologize. He's not saying, like, white people will look at me and say, oh, I don't like prosecutors. He's saying African Americans look at me and I'm getting this strange feeling from this guy. But even so, that reason is relating to his own perception. He's saying I'm more aware, perhaps, from certain types of jurists. Why should a prosecutor have to leave someone on that he tells doesn't like him? I mean, why would a prosecutor, you know, that is making a judgment and is critical of the profession that he's chosen? I mean, isn't that what the prosecutor is saying? Hey, the guy is judgmental of me, doesn't like me, and I don't want that person on the jury. That's precisely what we believe he was saying. He was noting a personal animus from that juror, not a race-based animus from that juror. It seems like a slippery slope, though, because if that happens, particularly outside the presence of the judge, that happened in the hallway, the description that we're just talking about now, it seems that that would be a card a prosecutor could play. You know, we're concerned about indicative discrimination. So couldn't that exception really swallow Batson? It's our hope that it won't. The Supreme Court's addressed this concern in various opinions. Can I ask you a question? Let him finish this one. Oh, I'm sorry. Just to briefly wrap up. The fact is that the trial court was there to observe the demeanor of the prosecutor when he was stating his reasons. It was there to make a credibility finding on his statement. Well, and that really gets back to opposing counsel's point, because the findings here, what we're talking about, perhaps being characterized as implied findings regarding demeanor, are pretty thin. It was a very terse ruling. We'll concede that. But even as you hypothesized yourself, Your Honor, a simple motion denied or no, that would be sufficient to find an implied finding of credibility. After all, that is the three-step process. But it wasn't in Snyder. I'm sorry? It wasn't in Snyder. It wasn't in Snyder because one of the primary reasons was found to be pretextual. And in that situation, you can't say, well, the court was specifically meaning to apply only to the good reason, not the bad reason. Here, we don't have any bad reasons, or at least I haven't heard any concrete evidence from appellants, creating a bad reason for either Juror Andrews or Juror Reeves. Judge Bregersen has a question. Hold on just a second. Let's check Bregersen's question. I just wanted to ask you this. How many habeas petitions are filed in the state court? In this case? Yeah, in California. There was, I believe there were two in the California Court of Appeals. No, no, I mean total. Total. For both defendants? No. No, for everybody. Globally, globally. In a year. Entirely? Yeah. I'd like to know because we get so much of your work that it affects probably, who knows, 50% of our, or maybe a little less than that, of our calendars. We have more than 30 magistrates down in L.A., I believe, that just basically handle these habeas matters that come from state courts. I'd be happy to offer a supplemental briefing on the numbers, but I can opine that this is a narrow window of cases. After Lennox, the Cal Supreme Court case, saying that we have to do comparative analysis now, we're up to now. I'm not talking about comparative analysis. I'm just talking about habeas matters. There are a number of habeas petitions. How many have you ever granted that you know of? I have no idea, Your Honor. I'm sorry. One, two, three? Presumably more than one or two, considering the presumably vast numbers of petitions that are filed. How many? I have no idea, Your Honor. I would be happy to look into it and file a supplemental briefing. Have you ever thought about that? No, I can't say that I personally have, Your Honor. Okay. So. I think Judge Perzan and then Judge Hurwitz. My question was that although with regard to Reeves and Andrew, you said that there were not one projectual question, but in each case, there was a race-based comment of some kind, right? With regard to Andrews, there was this odd observation about how she looked, which I suppose could be, coming from an African American prosecutor, could be a reason to discriminate against her, i.e. that she wasn't black enough. And as to the other, there was this odd sort of inside baseball, you know, we black people understand each other thing. So in fact, in both instances, there was a race-based, an expressly race-based comment at least. So why doesn't that lead to the same concerns as in Snyder? With regard to the other reason, Kevin. Addressing your questions in order. First, the comments regarding Andrews not appearing to black. Again, we characterize those comments differently than appellants. We'd say this was simply a comment on the fact that... It might have been, except that he said first and second. I mean, it was odd. And it certainly appears to be a reason. Not just to not... I mean, one way of looking at it was to say, well, I didn't know she was black, but that isn't true. We know it isn't true. And moreover, it was given as a reason. As if, you know, the fact that she's really not all that black is a reason why he couldn't have been discriminating, couldn't have been asking her because she was black, which is kind of silly. Well, whether he was attempting to dispel the idea that there was a prima facie case or simply trying to disclaim his own perception of her, whether or not he had actually looked at the questionnaire and noted her race before the Batson challenge was raised or not, either way, the fact remains that his comments were not describing a racial animus or group bias against Andrews or Reeves, and instead were simply statements. I also don't agree with the characterization of it as reasons. I realize that looking at the transcript, he says first and then second, and he's discussing reasons. It may be that he misspoke. If he had briefed this issue and had time to think about his comments, perhaps then it would be more compelling to our position. But in this particular case, he's responding on the fly to a Batson claim, and perhaps he misspoke. Let me ask as to a second reason for Andrews. He says, second of all, when she was in court speaking, she seemed very hesitant, very kind of intimidated, just kind of weird. He says weird for a lot of these people, as she responded to all of our questions. And it didn't seem as if she fully comprehended the situation as it was going on. Now, I have tried to locate every interaction in the transcript with Ms. Andrews, and there's almost nothing. So in all of our questions, first off, as far as I can tell, he asked no questions of Ms. Andrews. The questions asked to Ms. Andrews were either by the court or by one of the defense lawyers. Am I correct on that point? I can't recall any particular questions asked by the DA. I'd refer you to someone. I could find none. And on the point of she didn't seem to understand what was going on, here's now a question asked by Mr. Levy, one of the defense lawyers. Ms. Andrews, do you understand that, do you have a problem with, do you understand that these two people are presumed to be innocent? No. Now, that goes, she goes, you've heard that before, and she says, they're presumed to be innocent. Question, presumed to be innocent, they sit there, answer, they're presumed to be innocent. Again, do you have a problem with that? No. I see no confusion on her part. She says they're presumed to be innocent, and it's quite clear that her no is that she doesn't have a problem with that. So what am I supposed to do with the prosecutor saying she doesn't understand our questions when what she got was a perfectly lousy compound question from the defense lawyer. She basically translated it for him and tells him what the law is. So what the prosecutor says as a description of what she did is nonsense. What am I supposed to do with that? I would defer to the trial court that observed that interaction and the state appellate court that affirmed it. There's a sentence that's not... Well, when the state appellate court affirmed it, it said two very strange things. It said, well, she had to be told to speak into the microphone. Well, if that is an aspect of an incompetent person... Could you speak into the microphone? And the second one was this thing about the presumption of innocence, which, as Judge Fletcher says, seems to show quite the opposite. So they were grappling and came up with nothing on the record that would support any of this. Well, that's why the high court and this court occasionally has cautioned about reviewing a record, a cold record... But that's presumably why... But then we come back to the Snyder issue, because the district court, the trial court said nothing about this. There was nothing to show that she was... There was a specific question raised with regard to these demeanor question observations. And the trial judge didn't say that she observed any of this. But she did impliedly find that the prosecutor had been truthful in stating his race-neutral reasons for striking... That's one way of reading what she said. And the other way of reading it is that she thought as long as he gave a neutral reason, that was the end of it. May I ask you some questions about what actually occurred here? Because I'm not sure I understand the record completely. And I think they're yes or no questions, but if they're not, tell me why they're not. You agree that neither the state trial court nor the state appellate court did a comparative juror analysis? No, I do not agree. The state trial court did not perform any comparative analysis, but the state appellate court did consider a very brief claim regarding questions of sympathy to African-American jurors versus non-African. Well, okay. But other than saying that some non-African-American jurors were asked the same question, it did no comparison between them to see whether they were similarly situated. Other than that, correct. Okay. And I hesitate to interrupt for just a minute, but I want to say that as I read the court of appeal, it said no comparative objection was made and we therefore find a waive and we make none. That's what the court of appeal said. Right. The court of appeal actually said that they raved a comparative analysis issue with regard to this questioning about sympathy and then said, but in any event, it wasn't raised in the trial court. Okay. So let's now move to the district courts. With respect to the district court, you attempted to supplement the record in the district court with various items, right? Yes. And the panel opinion in this case, which is vacated, said we shouldn't consider them. Did the district courts consider them? Did the district courts consider them in these two habeas petitions? The district court in Jenkins certainly had them. Had them? I know it had them. That wasn't what I asked. Did it consider them? I believe that it considered them, but it did not perform any comparative analysis using them. Okay. And that was my last question. Neither district court did a comparative analysis, did it? McDaniel did, again, a similarly cursory examination. It said a comparative analysis wouldn't help because a bunch of white jurors were asked the same question about their exposure to crime. Correct. But that's not really a comparative juror analysis, is it? No. Okay. So just so that I'm clear, no comparative juror analysis done either by the state courts or by the district court here? No substantial comparative analysis. Okay. Could we do one? You could do one de novo. However, as we put out in our briefs, we don't believe that any comparative analysis would be helpful in this case. How do we know unless we first decide what the appropriate record is? Even if you were to consider the questionnaires that we provided in the district court and day one of the voir dire, there is still no comparison to be made for either of the jurors in the COA regarding their demeanor and justification. My last question, then. Why shouldn't we ask the district court to address that issue in the first instance? That would be your prerogative, but I would believe that... Yeah, and the same answer your opponent gave me. We could do whatever we want. My question is, why shouldn't we? I don't believe that it would be a useful use of judicial resources, especially as... Use one judge instead of 11? That strikes me as pretty efficient. Well, the record in this case is not expansive because the appellants didn't augment the record with the questionnaires of the non-judicial... But, you know, you talk about use of judicial resources. I make this statement based on a few years of experience. If the state courts did their job, our job would be a lot easier. But the state courts have not done their job. And you make it sound as if, oh, the trial court, there's some issues there that involve on a habeas or quorum nobis, whatever it's called, and then it goes up in an orderly way to the Court of Appeals and then to the Supreme Court. It doesn't work that way, does it? You can file your... A state prisoner can file his habeas petition directly with the Supreme Court. That's correct. He can file it directly with the Superior Court. That's correct. Right? Yes. And so we're not dealing with an organized system. If anything, we would... It's the way it is, isn't it? Yes. Yeah. A habeas petitioner and state habeas can petition directly in the Superior Court or in the Supreme Court. In my personal experience, they generally will go straight to the Supreme Court when they're seeking solely to exhaust... They do that or they can even go back to the trial court and they may even get a different trial court judge. We do believe... Depending on who's sitting in that department at that time. Well, in this particular case, though, Your Honor, the state courts did their job. The trial court heard the Batson objection, heard the reasons from the prosecutor and... We're just talking generally about how these matters are handled at the state court level and how they affect the work of our courts. Could you address how Snyder affects our consideration here? I mean, to the extent that there's a D-1... I'm not through talking. So what's your answer to that? I'm sorry, Your Honor. Regarding the state courts creating more work for the federal courts... It's not doing our job. Yeah. I mean, it's our position that the state courts do their job as a matter of general practice and in this particular case that they certainly did here. Well, you don't get that from reading some of the recent decisions that come down from the California Supreme Court. There's a lot of movement going on now to correct all these past cavalier practices that the state's been engaged in. I'll apologize to you on their behalf, but I can't comment on other cases. You're a young fellow and you got it corrected. I just thought we were doing our jobs when we were doing them. I think Judge Acuda's been trying to ask a question. Could you respond to my question about how we take Snyder into account given the timing of that decision? I do believe that because Snyder didn't come out until 2008 and the state court of appeals opinion in this case was in 2003, the operative one, that there was no clearly established law requiring, even if you were to interpret Snyder as the appellant's wish, requiring an explicit accrediting of demeanor-based justifications. And as I've argued earlier, we don't believe that Snyder stands for that proposition, that a specific and isolated demeanor-based justification must be affirmed specifically. Let's talk a little about the record problem that the HAL decision focused largely on. This is the first time I can't hear you. Oh, I'm sorry. I must be misandrist. Was there a motion made to augment the record? Yes. Who made the motion and what did it say? Do we know that? Jenkins' attorney made the motion. And what did he ask for? I believe the ‑‑ I'm unaware, but the motion was granted, and according to the docket I believe certain days, so whatever days of voir dire were actually before the habeas court originally were presumably those days. What was not included in the granted motion at least was the missing date, day one of voir dire. And you've checked that for the dates match up? I haven't checked specifically, and I'm not entirely sure whether that issue was developed in either the court of appeals. But the court of appeals itself, so you think the court of appeals itself did not ask for the transcript? I'm not certain. Although it could have. It certainly could have moved to augment the record itself, and that motion presumably would have been granted. So there's not a procedural default in the sense that there was no barrier to the court of appeals doing that? No. So therefore how could the panel opinion be right about if there was an obligation to do a comparative analysis and there was a means to do it without defaulting the parties? I mean, we are always calling for records that the parties shouldn't give us. That's true that the court of appeal can't do a full comparative analysis between every single, out of the dozens or hundreds of jurors that were involved in this case, it was extensive jury selection, without the entirety of the voir dire, but especially as here where the primary complaints are based on demeanor, no useful comparison could be made. And at the time when California law did not allow for the courts of appeal to consider generally, consider comparative analysis for the first time on appeal when it wasn't raised in the trial court, again. So you're telling us they didn't do it because they couldn't do it because the law was against them doing it, and therefore if we thought it should have been done, then we are outside of it? I don't believe we're outside of the ADPA because these records, while before the trial court, were not before the court of appeal and I don't see that there's any error. Can you just tell me that they wouldn't have done it anyway? They could have or would have had that issue been raised or had they been permitted by state law, but at the time this. Let me just ask you though, I wanted to get clarification. If I heard you before, you're saying that in the federal court, having the supplement of day one of voir dire plus the questionnaires, you don't object to that, correct? To this court's considering it? Or the district court? Well, I was ordered to provide the questionnaires in the district court. It's our position that the panel's reasoning is sound. So in other words, your position is they can't consider that? The last reason court decision was the California court of appeal decision and it did not have day one or the jury questionnaires before it. So how do you account for Miller-El then, where the Supreme Court starts looking at jury questionnaires that weren't in the lower courts? I don't believe in Miller-El that the records were not available or in front of the state courts. They just weren't considered. I don't know what the rules of Texas criminal procedure are and I don't know whether or not those voir dire records could have been before the state court, but not before the federal court. It can also be interpreted to say that it had to have been before the state courts. It doesn't specifically say it had to be before the court of appeal. It certainly could be. And particularly in this case where we are looking at what the trial court's credibility findings are. I mean, we're trying to. If our job is to see it as the trial court saw it, that's what the trial court had in front of it. Yes. So you're not bringing things that was not before a state court judge. Isn't that the pinholster issue? Correct. So there's nothing wrong with augmenting the record if all you are doing is filling the gap on appeal and showing what was before the trial court were in a room? Yes. As was held in Jamerson, recreating what the trial court had in front of it. If this court wants to consider that, that's a valid reason. The trial court did have all of the questionnaires. It was sitting at the voir dire, so it certainly had access to all of those records. Then it could be properly considered. So you're not arguing that Jamerson was wrong? Jamerson? Yes. You're not arguing that Jamerson was wrong, I decided? Jamerson was, we're going to say, a very narrow holding limited to the facts of that case, the DMV photos. I'm not understanding something. Are you saying, I mean, I understand what you're saying, that the panel decision was wrong, insofar as it said that we could not look at the questionnaires and the first day of the transcript? Because you're saying, as I understand it, A, the court of appeals couldn't and wouldn't have done it anyway, and that's really why they didn't do it, and B, if they wanted to do it and if they could have done it, they just could have gotten the transcript. They could have gotten the transcript, yes. They didn't, and so it was not before the court of appeal. But in Jamerson, it wasn't before the court of appeals either. That's correct. And this court considered the driver's license as photographs. Yes. Again, we believe that Jamerson was such a narrow case because he can't do anything without knowing the reason. It's narrow, but it seems to me it's considered something that wasn't in the court of appeals record, and so why doesn't it stand for the proposition that we can consider something that wasn't in the record before the court of appeals? Narrow, wide, broad, whatever. Isn't that the holding of Jamerson? Well, no. Again, I believe that Jamerson... What do you think the holding is? That when necessary to conduct, absolutely necessary to conduct comparative analysis, then you can allow this type of additional evidence in. However, generally, 2254 limits review to the records that were before the state courts during their... Well, but it was before the state court, didn't it? It doesn't say anything about appellate court or last reason decision. It just says before the state court. So it certainly wouldn't be inconsistent with the statute or with Cohen to look at what was before the trial court, would it? No, not necessarily. I did want to answer one more question regarding the view of the record on appeal. Because it is a cold record, things like hesitation and demeanor are not visible from the record. There's a sentence from Lennox, again, the Cal Supreme case, saying the sentence, she never said she missed him is susceptible of as many different interpretations as it has words, depending on the emphasis. Likewise here, when you're looking at the cold record and trying to determine what kind of question Andrews was answering or whether Mr. Reeves hesitated, that is not going to come across in the record. Counselor, that is opposing counsel's strongest argument. That's opposing counsel's strongest argument under Schneider. That's what he's arguing. That's why we have to have those demeanor findings. What's your response? My response is simply that the high court has repeatedly said that all courts should defer to the trial court that's reviewing the credibility. And when we don't have a specific finding, like here, what do we do? You look into the implied finding that the state court gave when it said there doesn't appear to be any kind of racism going on, after it heard those stated justifications. Because racism is such an odd and broad statement, it's hard to know precisely what she meant when she said that. Let me ask very specifically with respect to Reeves. The prosecutor says Reeves hesitated. McGanney, his lawyer, says he did not hesitate. The trial judge says nothing one way or the other, except to say there doesn't appear to be any racism going on. I don't have a resolution by the trial judge based on that as to whether or not there was a hesitation. I have the trial counsel on both sides characterizing it differently, and I don't have the trial court telling me which one of those two propositions it believes. What do I do with that? Well, when faced with that type of situation where reasonable minds could differ on the interpretation of the record, then under the ADPA you should defer to the state court's rulings. No, but what I'm telling you is I don't think the state court ruled on that particular issue, whether or not there was hesitation. The trial court says it does not appear that there was racism. I agree. There is no explicit ruling on the hesitation or any of the other demeanor-based challenges. There was just this blanket. There does not appear to be any kind of racism going on. But it's possible, you see, that the trial court said to itself, well, there was no hesitation. Nonetheless, I don't see racism. It's entirely possible that that's what the trial court meant. It is entirely possible. I mean, there are multiple interpretations of every sentence in the cold record. But hasn't the Supreme Court told us that in this situation we give the benefit of the doubt to the state court? Yes, in particular the trial court, who was sitting there watching everything. Overseeing juries? Everything, yes. All right. I'd also like to refer briefly back to the question about the questions that were being asked of Juror Andrews and just remind the court that the trial court in this case conducted the bulk of its voir dire through the questionnaires and then itself. So the fact that the prosecutor may not have asked certain questions or may not have gone back and re-questioned certain jurors after finding something problematic in his mind is no indication of racial animus. When you say that, with respect to Andrews, are you saying that there was extensive questioning in the transcript by the court? Because I found essentially none. No, there was limited questioning for all of the jurors simply because... Well, there was a fair amount, for example, from Hilton, there was a lot. And with respect to Woods, there was a lot. With respect to the two would-be jurors as to which there's a COA, there's essentially none. Perhaps when there is an issue with a relative that was involved in a crime or a person, a potential juror in Woods' case, being involved in a police action, there may be more cause for the attorneys to go in there. And the trial court at the very outset of voir dire said, I'm going to go through these questionnaires and I'm going to highlight any problem areas. So perhaps that's why they were given more leeway to ask questions. But, of course, we don't have those questionnaires as to the struck jurors, correct? Correct. So we only... If someone were to do a comparative juror analysis, you have the seated jurors and then you have what you can define from the voir dire if you look at the all volumes, correct? Correct. And we also have the questionnaires for the alternates. For the alternates, right. Yes. Unless there are any further questions, we're prepared to submit. Thank you, counsel. Thank you. Mr. Cutchins, we'll give you three minutes. As some of the questions I think correctly pointed to, both logically and chronologically, the first fact here is that the California courts were not going to do a comparative juror analysis. And they weren't going to do it under any circumstances. As a result, for instance, the bulk of the questionnaires were simply discarded after trial. Did defendants make any comparative juror analysis arguments that were not considered by the state courts? No. But it would have been futile because the California Supreme Court at the time said, you don't do comparative juror analysis in the trial court. And then subsequently they said, oh, we don't allow it on appeal if you haven't done it in the state court. It's a little bit Lewis Carroll-ish, frankly. Is the state court required to do a comparative juror analysis? By Batson. By any Supreme Court decision? Yes. Tell me which decision. Miller L. Did Miller L. say the state court's required to do one? Or that the federal court should do one in its analysis on habeas? I'd like to answer that. Please. The term comparative juror analysis, well, let me back up. What Miller L. held was the comparative juror analysis is simply part of Batson's requirement that the court look at the totality of the facts. The term comparative juror analysis was coined by the California courts when they were explaining why that was something other than just part of looking at the totality of the facts. It isn't. It isn't. It's just part of looking at the totality of the facts. So your position is that Miller L.'s requirement that one look at the totality of the facts requires a comparative juror analysis? Well, Miller L. specifically requires it. But Miller L.'s a habeas case where the Supreme Court does it in the first instance. So my question is what case says the state court must do it? I understand your position that Miller L. implies it. Is there any other Supreme Court decision? Well, I think Miller L. does more than imply it, but I will rest on Miller L. What about our bank opinion in Kessler? Doesn't that say that? Our bank opinion in Kessler? Doesn't it read Miller L. to say that the state court, if it doesn't do it, is done an unreasonable fact-finding and, therefore, is not protected? That is, indeed, how I read Kessler v. Cambria, yes. So they weren't going to do it, which leads to the second point, which is that if the state court did take seriously its duty to review the totality of the facts, it could and would have ordered up the record. It's different from federal court. The state rules of court specifically say at any time the state appellate court can order up the record on its motion. I found in five minutes on Lexis hundreds of cases where the state court of appeal did just that and, in many cases, got jury questionnaires, jury voir dire, where the court of appeal thought that was relevant. Just to wrap, because we have to wrap up. Yes, ma'am. Could you, once again, the COA jurors, if I'm not mistaken, are Andrews and Reeves, and as to them directly, the comparative doesn't matter. Is that right? Except to the extent to which they were queried about sympathy. Oh, that's why I said juror. Except that they were worried about it. They didn't rely for either of them, or the prosecutor didn't rely for either of them on sympathy, did he? No, but he did, but there was disparate questioning of them, which in itself, I think, is a demonstration of that. That's the only way. So the last thing that I wanted to leave the court with is Snyder saying the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. What Snyder said was because the record doesn't show that the trial judge actually made a determination concerning demeanor, we can't credit that. I submit that this court is in the same position. Thank you, counsel. The case is heard, will be submitted for decision, and will be in recess.
judges: Thomas, Pregerson, McKeown, Fletcher, Berzon, Tallman, Callahan, Ikuta, Christen, Hurwitz, Friedland